**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**


JASMINDER SAHI,

     Plaintiff,       Case No.

v.              Hon.

LIFE TECHNOLOGIES CORPORATION,
A Foreign Profit Corporation,

     Defendant.

_____

**JENNIFER B. SALVATORE (P66640)
NACHT, ROUMEL, SALVATORE,
BLANCHARD & WALKER, P.C.**
Attorney for Plaintiff
101 N. Main Street, Ste. 555
Ann Arbor, MI 48104
(734) 663-7550
jsalvatore@nachtlaw.com
_____

**COMPLAINT AND JURY DEMAND**

  NOW COMES Plaintiff, JASMINDER SAHI, by and through her attorneys, NACHT,

ROUMEL, SALVATORE, BLANCHARD & WALKER, P.C., and hereby complains of

Defendant, LIFE TECHNOLOGIES CORPORATION, as follows:

**PARTIES AND JURISDICTION**

  1.  Plaintiff Jasminder Sahi ("Plaintiff" or "Dr. Sahi") is a resident of Ann Arbor,

Michigan in the County of Washtenaw.

  2.  Defendant Life Technologies Corporation ("Defendant" or "Life Technolgies") is

a foreign profit corporation with its headquarters located in Carlsbad, California.   Life

Technologies is a biotechnology tools company that provides premier systems, consumables, and services for scientific researchers around the world.

3.      This lawsuit includes claims for gender based hostile work environment, sex discrimination, and retaliation under the Elliott-Larsen Civil Rights Act and discharge in breach of public policy.

4.      Apart from this lawsuit, Plaintiff has also filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").  The EEOC is currently investigating the charge.  Plaintiff intends to amend her Complaint to add additional causes of action under Title VII of the Civil Rights Act of 1964 after she has exhausted administrative remedies and the EEOC issues a right-to-sue letter.  The causes of action under Title VII of the Civil Rights Act of 1964 are sex discrimination, gender based hostile work environment, and retaliation.

5.      This Court has jurisdiction over this dispute pursuant to 28 U.S.C. §1332.  There is complete diversity of citizenship between Plaintiff and Defendants in this matter as Plaintiff and Defendant are citizens of different states and the amount in controversy exceeds $75,000.00.

6.      Venue is proper in the Eastern District of Michigan pursuant to 28 U.S.C. § 1391, as it is the district where the Plaintiff lives and Defendant conducts business.  Plaintiff worked for Defendant in the district.

**GENERAL ALLEGATIONS**

7.      Dr. Jasminder Sahi was recruited to work for Invitrogen, a division of Life Technologies, when Invitrogen acquired her former company, CellzDirect in 2008.

8.      After she was recruited, Dr. Sahi worked as a Research Fellow for Invitrogen's Durham, North Carolina site.  Dr. Sahi's work involved extensive travel within and outside the

country.  On weeks that she was not traveling on company business, Dr. Sahi worked out of her home office in Ann Arbor, Michigan or from an office in Durham, North Carolina.

9.      The CellzDirect Division (also known as the ADME/Tox Division) of Invitrogen has two sites.  The group in Austin Texas is primarily a contract research laboratory conducting "Services" work for clients.  The Durham, North Carolina facility is mainly responsible for isolating and working with liver cells that are sold to pharmaceutical/biotechnology and academic laboratories for research purposes.  Dr. Sahi is an expert in primary liver cells, with 25 years of experience in this field.  Her job was focused on the "Products" side, rather than the "Services" side of the business.

10.     During her employment with Life Technologies, Dr. Sahi received only positive performance evaluations.

11.     Of the three senior scientists at Invitrogen (Dr. Tom Rushmore, Dr. Steve Ferguson and Dr. Sahi), Dr. Sahi was the only female and the only full-time scientist who worked predominantly on the "Products" side of the business.

12.     In Feb-March of 2010, three female subordinates discussed with Dr. Sahi concerns they had regarding how they – as women – were being treated by their new male manager, Markus Hunkeler.  Specifically, they felt that he treated them very differently than his one male direct report.  Dr. Sahi brought their concerns to the attention of her then-supervisor, Rob Brainin, who was the General Manager and head of the CellzDirect Division.  Mr. Brainin later told Dr. Sahi that he had spoken to Mr. Hunkeler about her concerns.

13.     While initially, when Mr. Hunkeler first joined the company, he treated Dr. Sahi with respect, as he was given more responsibility (and after she raised concerns on behalf of the other women), his attitude changed.  Dr. Sahi began to have concerns about how he treated her.

14.     Dr. Sahi also experienced some hostility and negative treatment from her two other male peers – Scott Arnold, who was made head of the Austin site and Joe Rogers, who was hired as head of the sales group.  In addition, after Mr. Brainin left and Mr. Hunkeler became the Durham site head, Dr. Steve Ferguson's attitude towards her became very negative.   For example:

(A) In January 2010, there was a meeting of all the senior managers of the CellzDirect division at Durham.  One concern that was discussed was that Services (Austin) was not making money.  Dr. Sahi started to give her recommendation on how this could be improved, but was abruptly cut off by Mr. Rogers.  He shouted out words to the effect of "We do not need negative people like you in the company - you should just get out."

(B) That same evening, there was a team-building event, and Dr. Sahi drove to it with Mr. Arnold.  As he was a new manager and she had earlier been responsible for some aspects of the Austin site, Dr. Sahi shared with him some of her knowledge of the team dynamics at Austin, with the aim of helping a new colleague and manager.  Shortly after that, Mr. Arnold reported to Mr. Brainin that Dr. Sahi was "a gossip."

(C) Shortly before she was let go, Dr. Sahi presented a ground-breaking paper at a conference in Europe.  The paper was very well received and over 100 scientists requested copies of her presentation.  At Defendant's Austin site, a client was given a copy of the presentation, and he questioned some of the statistics.  Instead of referring that client to Dr Sahi, or asking her for the information, Mr. Arnold sent off a series of e-mails questioning Dr. Sahi's work and statistics (Dr Sahi was not copied on these e-mails).  Dr Sahi found out about this when her manager questioned her on the multiple e-mails and realized that she was not copied on them.  While Dr. Sahi's manager agreed

with her that Mr. Arnold's behavior was irresponsible and unprofessional, there was no written or public acknowledgement of this or apology at any time.

(D) On more than one occasion, Dr. Steve Ferguson, the senior scientist at Durham, spread incorrect stories about Dr. Sahi.  In one case he told several people at the Durham site that he had worked hard on a paper and Dr. Sahi had published it without his name on it.  This was completely untrue and a very serious allegation for a scientist.  Dr. Sahi spoke with her manager (Chris Armstrong) and Markus Hunkeler about it.  When no action was taken and untrue stories continued to be spread by Steve, Dr. Sahi made a formal complaint to HR via an email to Jennifer Mayenscheinin in the summer of 2010.  Dr. Sahi tried to set up meetings with Ms. Mayenscheinin to discuss this further, but these were not accepted or were cancelled, HR did not discuss this serious complaint with her at any time, and no action was taken.

15.     One way in which Mr. Hunkeler treated Dr. Sahi differently was by ignoring her in meetings.  One particularly egregious example occurred early in the year, when Mr. Hunkeler set up a meeting to learn about how the pharmaceutical industry works in ADME/Tox.  Dr Sahi was the only person in the conference room to have worked in the pharmaceutical industry and she had extensive experience and knowledge in this area.  For over one hour, however, Mr. Hunkeler directed questions to the male senior scientist in the room (Steve Ferguson), who had never worked in the pharmaceutical industry.  Dr Sahi kept trying to answer, until Mr. Hunkeler started each question with: "*So Steve*, what does Pharma do for…."  Steve would try to respond and then turn to Dr. Sahi and ask her to answer, as he did not have the answers.  It was a difficult, awkward meeting in which Dr. Sahi was obviously being insulted in front of many junior colleagues.  Another participant at the meeting, Ms. Rupali Lach (who reported to Mr.

Hunkeler), spoke with Markus Hunkeler about this after the meeting.  According to Ms. Lach, he just dismissed her concerns.

16.    Mr. Hunkeler's demeaning behavior towards Dr. Sahi continued throughout 2010. For example, if Mr. Hunkeler had a simple question to ask Dr. Sahi, instead of picking up the phone or sending her an e-mail, he would set up an outlook meeting and include Mr. Arnold and Steve Ferguson in the meeting as well.

17.    In another case, Dr. Sahi and a professional colleague had been working on a scientific collaboration for over a year, and it had finally come to fruition.  As was the protocol, Dr. Sahi sent e-mails to the team involved in this work, as well as the two people responsible for Services work in Austin, to keep them in the loop.  Mr. Arnold set up a teleconference with multiple people and Dr. Sahi about this project, and reprimanded her for not including an additional person from the Austin site, even though this was contrary to past practices.  Mr. Arnold continued to tell Dr. Sahi that she had caused a lot of confusion, and that her actions were not appropriate.  When she questioned this further, Mr. Arnold admitted that this was a new policy he had instituted "a week or so ago" at the Austin site and that he had not sent any notification to Dr. Sahi about it.  Nonetheless, he took the opportunity to demean Dr. Sahi in the presence of multiple subordinates.

18.    In addition, Mr. Hunkeler consistently provided negative feedback and commentary about Dr. Sahi to her supervisor.  For example, he said she created "swirls" whenever she was in Durham.  When Dr. Sahi asked her manager for specific examples of these events, so that she could improve herself, he told her that he had asked Mr. Hunkeler that question, but that he could come up with nothing specific, just a feeling.  Dr. Sahi's manager

suggested that she approach Mr. Hunkeler about it.   However, when she did, Mr. Hunkeler declined to discuss it with her.

19.      In discussions with management about the difficulties Dr. Sahi was having with male colleagues, it was suggested to Dr. Sahi that she modify her own behavior and mannerisms so as not to be so outspoken.   In contrast, Mr. Hunkeler and Mr. Arnold are both known for being aggressive, outspoken managers.   A different code of conduct was obviously required for Dr. Sahi, the only woman at that level in the group.

20.      On October 14, 2010, Dr. Sahi spoke with her new supervisor, Chris Armstrong, about her concerns regarding Markus Hunkeler's treatment of women.

21.      Still, Mr. Hunkeler's attitude towards women (and towards Dr. Sahi specifically) did not improve.   For example, on October 28, 2010, Dr. Sahi had a meeting scheduled in Durham with Mr. Hunkeler at 7:00 a.m., a time he suggested.   Dr. Tom Rushmore, another off-site senior scientist, also had a meeting scheduled with Mr. Hunkeler, right after Dr. Sahi's meeting.   Mr. Hunkeler sent Dr. Rushmore an e-mail cancelling their meeting the prior night, but did not extend the same courtesy to Dr. Sahi – who showed up for the meeting two hours before normal working hours in Durham.   When he didn't show up for the meeting, Dr. Sahi left a post-it on Mr. Hunkeler's computer asking him to call her when he got in.   However, she never heard from him.   Later in the day, Mr. Hunkeler walked up to Dr. Sahi and Dr. Rushmore, apologized to Dr. Rushmore for postponing the meeting and asked if Dr Rushmore had time to meet with him.   He completely ignored Dr. Sahi.   When Dr. Sahi asked him if he had gotten her message, he nodded and said he forgot about the meeting, as he had not put it on his outlook calendar.   Dr. Rushmore confirmed that his meeting was not on the outlook calendar either.   This was typical of the derogatory behavior meted out to Dr. Sahi.

22.     On November 2, 2010, Dr. Sahi had her quarterly review with her supervisor, Chris Armstrong.  Mr. Armstrong indicated that he was completely satisfied with Dr. Sahi's performance, and to keep doing what she had been doing.

23.     On November 3, 2010, Dr. Sahi again mentioned to her supervisor that she was concerned about Hunkeler's treatment of women.

24.     On November 4, 2010, Dr. Sahi participated in a R&D meeting.  In that meeting, data was presented showing that a product (CHRM) sold by Life Technologies did not do what it was marketed to customers to do.[1]  Dr. Sahi was the most senior scientist at the meeting.  She suggested that the company needed to do additional experiments, prior to selling any more of the product, and that marketing and legal would have to figure out how to communicate this information to their customers.  This information was transmitted to Mr. Hunkeler by Dr. Steve Ferguson shortly after the meeting.

25.     On November 7, 2010, Dr. Sahi left for a one week business trip to Europe.  The trip was very successful, and she and Mr. Armstrong received several emails regarding the immediate revenue her meetings had generated for Life Technologies.

26.     On November 17, 2010, when Dr. Sahi returned from her business trip to Europe and went to Durham, she was informed by another scientist that additional experiments on CHRM had confirmed that the product fraudulently made cells appear to be alive, when actually they were dead.

27.     Later that same day, at approximately 6:45 p.m., and just two weeks after her positive performance evaluation, Dr. Sahi's employment was abruptly terminated allegedly due

---

[1] Specifically, CHRM (cryopreserved hepatocyte recovery media), which Life Technologies exclusively markets to customers and uses for characterizing all of the Company's human cryopreserved hepatocyte preparations, likely makes dead hepatocytes appear alive, increasing revenues for the company substantially.

to a restructuring within Life Technologies.   Dr. Sahi had no warning or notice of her termination.

28.     Dr. Sahi asked for access to her computer files so that she could retrieve time-sensitive publication-related and personal files.   Her request was denied, and she was immediately cut off from all access to her computer and telephone.  In contrast, other terminated employees have been allowed access to their computers and time to transition out of their positions (in most cases between 1 to 6 months).  Dr. Sahi was eventually sent a small number of files, but nowhere near what she needs to fulfill her scientific responsibilities.  In spite of the fact that she was told she could continue to work on her publications, she has yet to be sent the data she needs to do so.

29.     Shortly after Dr. Sahi's termination, Life Technologies announced that it was shutting down its services work in Austin (and closing the Austin site) so that it could focus on products – particularly hepatocytes (the area where Dr. Sahi specialized for 25 years, an experience nobody else in the company has).

30.     Dr. Sahi's supervisor stated several times to Dr. Sahi that her termination was not related in any way to the Austin site closure.  The company also repeatedly told Dr. Sahi that her termination was not performance related.

31.     Despite its new plan to focus primarily on products, Life Technologies chose to terminate Dr. Sahi, (who worked predominantly on products and has been working with hepatocytes since 1983) and keep a less-qualified, male scientist (Steve Ferguson) who has worked predominantly in Services-related work since he joined the company and has relatively limited experience with hepatocytes and the transporter products sold by the CellzDirect division.  The fastest growing sales for the CellzDirect Division were for transporter products

9

that CellzDirect sold in collaboration with Genomembrane, a company in Japan.  Dr. Sahi was completely responsible for this collaboration and is one of the world experts in transporters.  She was also the only Transporter scientist at CellzDirect.  Life Technologies also retained the second senior scientist (Dr. Tom Rushmore), whose responsibilities were significantly less than Dr. Sahi's.

## COUNT I: GENDER BASED HOSTILE WORK ENVIRONMENT
### (Elliott-Larsen Civil Rights Act and Title VII)

32.     Plaintiff hereby realleges and incorporates by reference paragraphs 1-31 above.

33.     Plaintiff is a female.

34.     Plaintiff was subjected to hostile communication or conduct that was directed at her because of her sex.

35.     The hostile conduct or communication was intended to and/or in fact did substantially interfere with the employee's employment or created an intimidating, hostile, or offensive work environment; and

36.     Defendant had actual or constructive notice of the hostile work environment and failed to take prompt remedial action.

37.     As a result, Plaintiff was harmed and continues to be harmed, in that she has suffered economic loss, damage to her professional reputation, and emotional distress.

38.     Plaintiff will add a Title VII claim once she receives a right-to-sue letter from the Equal Employment Opportunity Commission.

## COUNT II:  SEX DISCRIMINATION
### (Elliott-Larsen Civil Rights Act and Title VII)

39.     Plaintiff hereby realleges and incorporates by reference paragraphs 1-38 above.

40.     Plaintiff is a female.

41.     Plaintiff was subjected to adverse employment action when she was terminated.

42.     Plaintiff was qualified for her position.

43.     Plaintiff was replaced by a person not a member of the protected class and/or was treated differently than similarly-situated male peers.

44.     As a result, Plaintiff was harmed and continues to be harmed, in that she has suffered economic loss, damage to her professional reputation, and emotional distress.

45.     Plaintiff will add a Title VII claim once she receives a right-to-sue letter from the Equal Employment Opportunity Commission.

## COUNT III:  RETALIATION
### (Elliott-Larsen Civil Rights Act and Title VII)

46.     Plaintiff hereby realleges and incorporates by reference paragraphs 1-45 above.

47.     Plaintiff engaged in protected activity when she made complaints about sex discrimination.

48.     Defendant knew about Plaintiff's protected activity.

49.     Defendant took action that was adverse to the Plaintiff when it terminated her.

50.     There was a causal connection between the protected activity and the adverse employment action.

51.     As a result, Plaintiff was harmed and continues to be harmed, in that she has suffered economic loss, damage to her professional reputation, and emotional distress.

52.     Plaintiff will add a Title VII claim once she receives a right-to-sue letter from the Equal Employment Opportunity Commission.

## COUNT IV:  DISCHARGE IN BREACH OF PUBLIC POLICY

53.     Plaintiff hereby realleges and incorporates by reference paragraphs 1-52 above.

54.     Plaintiff was an employee of Defendant.

11

55.     During the course of her employment with Defendant, Plaintiff refused to acquiesce in violations of law, and internally objected to illegal practices regarding the fraudulent marketing and selling of Defendant's product.

56.     Because Plaintiff raised concerns about potential fraud, she was terminated.

57.     As a result, Plaintiff was harmed and continues to be harmed, in that she has suffered economic loss, damage to her professional reputation, and emotional distress.

WHEREFORE, Plaintiff respectfully requests that this Court award Plaintiff damages in an amount to be determined at trial for the damages to Plaintiff's professional and personal reputation and emotional distress, for Plaintiff's economic loss, and for costs, interest, attorney's fees, statutory penalties, and any other relief that this Honorable Court deems just and proper.

Respectfully submitted,
NACHT, ROUMEL, SALVATORE,
BLANCHARD & WALKER, P.C.

Dated: March 8, 2011                    s/ Jennifer B. Salvatore
                                        Jennifer B. Salvatore (P66640)
                                        Attorney for Plaintiff
                                        101 N. Main Street, Suite 555
                                        Ann Arbor, Michigan 48104
                                        (734) 663-7550
                                        jsalvatore@nachtlaw.com

## DEMAND FOR JURY TRIAL

Now Comes Plaintiff, Jasminder Sahi, by and through her attorneys, Nacht, Roumel,

Salvatore, Blanchard & Walker, P.C., and hereby demands a trial by jury in the above captioned

matter.

Respectfully submitted,
NACHT, ROUMEL, SALVATORE,
BLANCHARD & WALKER, P.C.

Dated: March 8, 2011                    s/ Jennifer B. Salvatore_____
                                        Jennifer B. Salvatore (P66640)
                                        Attorney for Plaintiff
                                        101 N. Main Street, Suite 555
                                        Ann Arbor, Michigan 48104
                                        (734) 663-7550
                                        jsalvatore@nachtlaw.com